Good morning, Your Honors. May it please the Court, I'm Clay Seaman, appearing on behalf of Mr. Boyer. We're going to split the oral argument with the Court, this morning before the Court, with the Court's permission. Mr. Levine, lead counsel, Mr. Levine, will argue the eyewitness identification, Phillips issue, and such other matters as time may permit. And I'm going to start off with the two claims that I, I, and as you know, you have 30 minutes between you, including rebuttal. Yeah, I understand. I'd like 15 and, or 12 and I'll reserve it. It's just watch the clock as it goes. Okay. Thank you, Your Honor. The two claims that I would like to discuss with the Court, this morning, are whether the failure to present evidence of Petitioner's pervasive brain damage in both guilt and penalty phase constituted ineffective assistance of counsel within the meaning of the Sixth Amendment. Those are claims 16 and 17 in our petition. In virtually all Federal habeas cases, the first question to be answered is whether the habeas rules permit this Court even to reach the substantive issue. And in this case, the lower courts' unreasonable application of clearly established Federal law and unreasonable interpretation of the facts. Now, the real case, the real contest here, swirls around the standard of care. Was trial defense counsel required to investigate whether or not appellant had brain damage more severe than a personality disorder? The thrust of the lower court's opinion and that of the argument of the Attorney General is that because trial defense counsel sent an appellant to be examined by multiple mental health professionals, that's all he needed to do. But in the defense view, that argument was unsupported either by the record or the law. Defense counsel was not casting a real question. Well, how many experts did he send him to before we get to the Dr. Nettleman recommendation? Well, we had three trials here. So some of them ---- Two, three, four, at least four. I was thinking, well, I read through and I thought at least six, but maybe you're better at it. So then when we finally get to Nettleman, we had mental health experts who had weighed in five times, at least five times previously. And then we get Mr. Nettleman's recommendation. And as I understand it, that was one day after the defendant's third and final trial started. And then it said, or even his recommendation said, that the defendant's MRI was normal, but that the EEG showed some abnormalities. That's what we have in front of us, right? That's correct. That's correct. Now, we do have, since, another expert who's come in and evaluated and put together stuff, but we're really talking, as I understand it, about what was counsel's obligation given the report saying nothing more. I mean, I'm trying to de-minimize it just to give you the business, but if I were talking to the EEG showed some abnormalities. And there was also a recommendation to follow up with neuropsychometric testing. I understand what the recommendation was, but nonetheless, that's what we have, right? Yes. And the counsel then had to make a decision at that point. That's correct. All right. So with that, then I have to look at my precedent, don't I, and kind of focus in on the precedent that I would have down here about what I should do in this instance. Yes. And because, really, to some extent, I've got counsel making the determination, which is one prong, and then I've got the lower court in a state court making the determination, which is a second problem. Yes. So I've got a second prong. So I've got a double deference to give. At least that's what I've been told in Harrington, a double deference. Okay. And then I go to West. Did you look at West? No, Your Honor. West v. Ryan? I have Hurls v. Ryan, but I don't have West v. Ryan. All right. You've got Earp v. Cullen, right? Yes, I think so, yes. So how do you distinguish Earp v. Cullen from your case? Your Honor, you caught me at a senior moment. I don't remember the exact facts of Earp. I'm sorry. Well, Earp v. Cullen was one both sides are arguing about. It seemed as if the government, at least, is pretty proud of that case. And in that case, we said counsel was not ineffective in large part because he at the time of the trial. The psychologist who examined Earp concluded that while he was a sociopath, he didn't have organic brain damage. Right. And in this particular situation, we've got five people who don't say anything about it, and we've got one person saying, well, maybe you ought to go look at this. There's some abnormalities, and they're saying that doesn't seem enough. In the defense view, I think the factual differences here are sufficient to distinguish that case, and if I may, the recommendation, of course, was, let me back up. The reason he sent him, the reason defense counsel sent appellant to Dr. Noodleman was to find out if he had organic brain damage. I mean, he wasn't just sort of casting around. But the others he sent, for what? It seemed to me that the recommendation and the sending to the experts was not any different for any one of them. Well, some of the experts, he didn't have any choice. I mean, some of them were court-ordered, so, but in the ones he... Oh, I know, but they were looking for the same kind of stuff. Yes, they were. And according to Dr. Kazanov, they obviously made the wrong diagnosis because you can't make a diagnosis of antisocial personality disorder unless you discount organic brain damage. And that was the problem here. That's the whole problem with negligence. This isn't a tactical decision. This is negligence, pure and simple, because he sent the defendant to Noodleman to find out specifically if there was organic brain damage. Noodleman came back and said, I think the CAT scan is normal, but you need to conduct neuropsychiatric testing in order to find out if there's organic brain damage. Well, I'm very sorry you didn't look at West, so I'll just tell you. I mean, West counsel promptly secured multiple mental health evaluations, no indications of mental impairment. One expert said that such an impairment could not be ruled out absent further testing. Right. And then counsel chose to pursue legal arguments instead of that one, and we said, no problem. Not a problem as far as the first prong of the Strickland test. And in fact, we said, not be ruled out absent further testing was insufficient to warrant a conclusion that counsel was ineffective for failing to undertake further investigation. That's what we said? Yes. Well, so how do I distinguish that? In this case, because the whole thrust was the failure to follow up on his own expert's recommendation. Well, but this is the same thing in West. One expert said that he sent him to, such an impairment could not be ruled out absent further testing. And in this case, what Dr. Noodleman said is you need to conduct this to find out if there is organic brain damage, because the EEG is abnormal, and that's why you have to go there. Well, but the problem that I have is this. Since West, which is in 2010, we've come out with Levitt. Levitt was even stronger. Experts said no impairment, but go get some neurological testing. And then there was a later MRI that revealed the damage that could have caused the personality disorders, but there were five prior mental health experts that said no. And once again, I'm left with, we said not enough. Well, Your Honor, in the defense of us, we're only three, and we've got to follow what our Court does above us. Right. But in the defense view, because the trial defense counsel said he had no tactical decision for failing to do that, and that's really the problem and why we have a prima bias level, is because in the declaration, Mr. Merwin, the defense counsel, said I had no tactical reason for not doing it, I just didn't do it. But I had a problem with that, because Harrington, looking at that issue, said we have to look at objective reasonableness at the time, not what the attorney may say afterwards when, you know, post hoc rationalization, oh, I wish I had done more. So really, his affidavit really doesn't matter. What matters is whether it was objectively unreasonable at the time to not require further testing. Well, in the defense view, it's objectively unreasonable not to follow your own expert's advice. I mean, I understand the Court's position on this, but in the defense view in Wiggins v. Smith and Bell v. Cohen, those kinds of things, you have to get through that tactical decision. So the State court said it wasn't a deficiency under these circumstances. And as Judge Smith said, we would have to say that the State court's determination that it wasn't deficient was an unreasonable application of Strickland. So we have this double issue. Even if we would agree with you, we would have to say, well, the State court was objectively unreasonable, even in light of our cases of West and Earp and Levitt, to say that it wasn't deficient. How do we get there? Well, Your Honor, in this case, first of all, we don't have a decision from the State court. I mean, we have a postcard denial. So the question is, was that reasonable, as the Court pointed out? And in the defense view, it simply was not reasonable. That's an unreasonable interpretation of the facts, because here we have clear evidence of serious mental dysfunction, particularly in the way the crimes were committed. So Strickland is a very general standard. Yes. And the Supreme Court has told us in resignance it would give State courts more leeway. Right. And you cited also other general standards. Yes. What's your – what Supreme Court case did the California Supreme Court unreasonably apply in saying this wasn't deficient? Well, in this case, I would say Wiggins v. Smith. See, here we have the declaration from Mr. Merwin that, in fact, he had no tactical decision. Now, I understand the argument about, you know, later comments should not affect. That's not an argument. That's the Supreme Court in Harrington. I understand that. But what he's talking about is what he did at the time. And he said, I didn't do that at the time. I didn't – I didn't – I don't recommend – or, I mean, I didn't remember doing this and remember getting this and so on and so forth. That's clearly negligence, Your Honor. That's – it's unreasonable to establish some sort of tactical decision, reasonable decision to do it. That's just flat-out negligence. So if I swallow your argument and go to the prejudice prong. Yes. At best, I've got a battle of experts. Kozlov's – and I probably said that wrong, I'm from Idaho – assertion versus others. I've got defendant acted to conceal his culpability for the crime. After the crime, he tried to conceal it, knowing he – which looks like he knew he did it and knew the nature and character of his actions. And then I've got undisputed evidence. He committed the crime. He stole the money. He acted rationally immediately after the crime. Where's the prejudice? Dr. Kozlov's declaration – I mean, Dr. Kozlov is going to say what he's going to say. Right. But I've been in court enough times to know. In fact, I thought I was going to win a contest about environmental pollution on cows. And I had the best expert in all of Idaho come, and I lost. So Kozlov's going to say what he's going to say. It happens to all of us, Your Honor. And on the other hand, we've got experts who are going to say the opposite. So at best, I've got a battle of experts. And then I've got undisputed he did it, undisputed he stole the money, undisputed that he acted rationally right after the crime, and he acted to conceal his culpability, which looks like he knew he did it and knew the nature and character of it. Now, you tell me how that's going to be prejudicial. Because first of all, we have to be able to test the diagnoses by these other mental health professionals in a court proceeding. In other words, they have to be under oath. Do they agree that their diagnoses are invalid given Dr. Kozlov's diagnosis here? Can we discuss Dr. Kozlov's diagnosis? I found her affidavit to be very equivocal. She said organic brain damage, which as I understand it just means reduced brain functioning. And then she said, well, I can't tell what his mental state would have been, but it's possible that if he has organic brain dysfunction, then maybe he could have had a psychotic break. And if he had a psychotic break, then maybe this could have happened. So very equivocal, it seemed to me. Well, what she said, it was consistent with a psychotic break. She didn't, but she didn't diagnose him as having a psychotic break or as being psychotic. It was just speculative based on the damage, which she said was organic brain damage. Right. So it seemed like the value of her testimonies seemed quite small to me. Well, Your Honor, we would disagree. I mean, let's suppose, let me give the Court a hypothetical. Let's suppose we have a decedent who is found at the bottom of a set of steps with blunt force trauma. The prosecution's argument is, hey, he was hit with a crowbar. Defense argument is he fell down the steps. When the forensic pathologist comes in to testify, the prosecution asks, is this consistent with being hit with a crowbar? Yes, it is. Is it consistent with falling down the steps? No, it isn't. And that's what Dr. Kazanov was getting at here. This is consistent with a psychotic break. So the defense would take issue with the Court's characterization that this is equivocal. It's certainly consistent. It's hard to go back that far and say, yes, this is exactly because we don't have any machinery that will do that or anything. But certainly within her professional opinion, that would be consistent with a psychotic break. And she looked at what happened at the crime. In other words, the stabbing was not goal-oriented in the sense that it was a frenzy killing. Well, so then we're back with Dr. Klede saying he is malingering. He didn't tell me about this hallucination the first two times I spoke to him. But he's goal-oriented. He's rational. So then we get into this battle of the experts. It's certainly consistent with rational behavior also. Well, first of all, he did talk about the hallucinations. Not to Dr. Klede, but to other people back at the time of the crime, 82 and 83. Who did he talk to? He didn't tell his girlfriend. He didn't say that to Mr. Kennedy. No. He didn't tell Mr. Klede. So I couldn't find in the record who he was. The two, there was an argument about whether or not the double hearsay, this is not in the claims that are before this Court, but in the record, there was two court-appointed psychologists, or one of them may have been sent by the defense, but I think they were both appointed by the Court. In any event, they, he related that to them. And then there was a question about whether or not he had said something about whether or not the hallucination was true or not. So that's, but he did mention it back then. He didn't mention it to Klede. And that's the point. Scalia, you've used 18 minutes for your side. All right. You only have 12 minutes total for your side. I just let you know that. Thank you, Your Honor. And really, just one quick on the prejudice thing, this is not whether or not he goes to one or two standards of deviation from the normal. This is a question of behavior. In other words, he's had a history, a lifetime of making dysfunctional decisions, and that's what Dr. Kozanoff's brief was. That's what the declaration goes to, that he has a history of dysfunctional decision-making. The prosecution's argument in this case was that he made moral choices. He can't make good choices. That's why there's prejudice here. If the jury knew that he could not really make conscious moral choices because of his brain damage, that certainly would go to the legal defenses, as we pointed out in the briefing. He would also go to penalty phase, because that would go to his moral culpability. And under California law, moral culpability, the death penalty is a normative decision, and therefore, if even one juror decided that because of his brain damage he was not fully in control, rational for his choices, then that would be persuasive in the defense view. That would be persuasive mitigating evidence of the highest order. And with that, I'm going to turn it over to my co-counsel. Very well, counsel. Thank you. Good morning. It appears as though some of my thunder and some of my minutes are gone, but I'll try to be concise. Counsel, please introduce yourself. I'm sorry. Joel Levine. I'm co-counsel for Mr. And you have checked in with the deputy clerk. I don't see your name on the docket, but that's fine. I'm sure that will be taken care of very well. Okay. I'm sorry if I caused that to occur. I was going to speak about the Phillips issue, the Phillips issue being the failure of the trial court to screen the evidence of the uncharged homicide. And given the fact that our time is going to be somewhat limited, and I will gladly entertain any questions the Court has, I think there's something else more important that I need to address in terms of the overview of both Mr. Seaman's arguments, the Attorney General's arguments, and everything that the Court has to consider here. And that is, it came up in some of the colloquy earlier today about deference. The Court seems to be quite familiar with Harrington v. Richter and Pinholster. But I think another important ingredient of the overview and the analysis that the panel of this Court in Hurls v. Ryan. And one of the things that I thought Hurls v. Ryan said, and that was about a year ago, was that in certain circumstances the amount or the type of deference that should be given by an appellate court to the actions of a State court in this context has to be a little bit more circumspect and limited when there has been a prima facie showing of a claim. A request was made in the State system for an evidentiary hearing, and also a request was made to conduct discovery for purposes of. That was quite an unusual circumstance, where there was a question about the judge bias. Isn't that what you're talking about? That was the underlying question in that case. And there was a question about the recusal of the judge and whether the judge would be able to evaluate the person's petition, given that she had previously ruled on it and been involved in litigation. I don't see how that would affect our analysis here. Well, I beg to differ, because I don't think that the holding in Hurls v. Ryan was limited to only the facts of that case. I thought that the panel in that case addressed the procedural aspect of how much deference should be given in the context where there has been no State hearing, even though one was requested. And I think also in that case, I may be wrong, there was also a postcard denial. I'm not sure. But that case was relying on Supreme Court cases, which held that a judge cannot be the judge in their own case, and that in those situations, a judge has to be recused or there's a due process violation. So that was relying on and interpreting the requirements of these Supreme Court cases. So here, Phillips is a State court decision. There is no Supreme Court decision which requires that sort of evidentiary hearing that I'm aware of. Is there? Not in that context. But if you read Watkins v. Souders, which addressed the issue, I believe what Watkins v. Souders said was there is no absolute rule that you have to have a hearing to screen the evidence. There is no absolute rule that you don't have a hearing, but given the right set of circumstances, due process requires that the Court have a hearing. And that was the last sentence. So the case says you can bring the defendant to the hospital bed of the victim for identification, and that doesn't require a hearing subsequently. And then in the last sentence of the opinion, the Court says there may be some circumstances where it's constitutionally required, but it's not here. So how can we say that the State Supreme Court's decision was an unreasonable application by not finding that it was required here? Because the circumstances and the facts of our case differ substantially from the facts in Watkins. And if those facts had been reasonably applied to Watkins v. Souders, it's our position that a hearing should have been held. But there's no Supreme Court case so whole. The Supreme Court, Watkins just says there may be circumstances where it is, but it doesn't explain what those circumstances are. So how can we say the California Supreme Court was – applied that case unreasonably? Because if they account for the facts of our case, the Boyer case, and apply them to the part of the Watkins v. Souders case which said if the appropriate case comes along, you have to have a hearing, that wasn't applied here. That's the rub in Boyer. But it seems to me that what you're – I mean, Judge Ikuta is certainly asking the same questions I would have asked about this particular thing, because in my reading of Watkins v. Souders, it says there are circumstances which might suggest this is a situation for a hearing. But at that point, it seems to me the State court is as good a position as are we at determining whether this is the particular circumstance. And I have a trouble finding why I don't give deference then to the State court in making that determination. If the language had said in this kind of a situation, you have a hearing, that would be one thing. But it didn't. It said the Constitution requires no such hearing. And what it said was, instead, there may be circumstances when you would have one. It didn't outline when it would be, so it seemed to me – I mean, I'm just – when I read it, I said, why am I in a better situation than the State court at making that determination? Because the circumstances – Because I owe deference to the State court, and I'm trying to figure out being a former State judge. Why I'm in better deference, why I'm in better shape to make that decision, why simply because I sit here in the federal system, am I a better judge of what those circumstances ought to be, if nobody's outlined the specific circumstance? Well, that's – in answer to your question, if that's what the question is, that's where the overview argument I was making a few moments ago about Hurls, which we just had a little colloquy about. Well, I'm glad she took you up on Hurls, because I'm not sure Hurls is even applicable based on the facts therein. But you've responded, and now I've got to think about your argument. And that goes to the amount and the degree of deference that you're addressing when it comes to whatever the State court did here. We don't really know what they were thinking, because we don't have a record of what they were thinking. But give – be that as it may, that circumstance certainly pops up in many of these cases. But I think that's why the Hurls court was critical. Counsel, you're down to about three minutes, if you wish to resume. And we're going to save some for rebuttal. I thank you for your time. Very well. Very well, counsel. We'll hear from the State. Good morning. May it please the Court, Lisa Jacobson, Deputy Attorney General, for the respondent. The California Supreme Court reasonably applied Strickland to the facts of this case in rejecting Boyer's ineffective assistance of counsel claims, and also reasonably rejected his Phillips claim. Starting with the Strickland claims, as Your Honors pointed out, counsel could have reasonably relied on the expert opinions in deciding to forego further investigation into Boyer's mental state, particularly given, under California law, evidence of organic brain damage does not necessarily negate or lessen criminal liability, and given the strong evidence in this case that Boyer's testimony – or Boyer's behavior that night was goal-directed. The California Supreme Court could also have reasonably concluded that Boyer failed to establish prejudice, given the problems with Dr. Kasanoff's opinion. It was based on that hallucination claim that all of the other experts found suspect, both the defense experts and the court-appointed experts, and the jury, in fact, rejected, and also given the strong evidence, again, in this case that Boyer's behavior was goal-directed. As for one of the points that was discussed earlier about when this hallucination claim first surfaced, as Your Honor pointed out, Boyer didn't tell Kennedy about it right after the murder. Instead, he told Kennedy that he got into it with some drug dealers, and he got them, and they got him. He didn't tell Cornwell about it that night. He told Cornwell he got into it with a loan shark. He didn't tell the police about it a week later when he confessed to the murders in a recorded interview, and he didn't tell Dr. Klatt when Dr. Klatt, the defense-appointed expert, interviewed him 24 and 32 days after the murder, for a total of four and a half hours. The first time I saw it in the record was in March 1983 during interviews with the psychopharmacologist Siegel, and Dr. Siegel didn't believe the hallucination. He thought it was possible that he had a flashback, but he thought Boyer, rather than responding to the maniac in the Halloween II movie, was possibly playing the role of the maniac in Halloween II. I guess, to be fair, my biggest problem with the state's case is that they tried a homicide that I thought didn't have evidence that would go anyplace, anywhere, anytime in a real case for murder, and they tried it in the penalty phase. Oh, the uncharged conduct? That's my biggest problem with your case. I mean, it seems to me that I went through the evidence, and I'm having a tough time understanding how that's evidence that is beyond a reasonable doubt, and I'm having a tough time understanding why that evidence didn't overshadow what happened in this sentencing, and I'm worried about whether the court ever ought to have heard it. I'd respond in a couple of ways. First off, Boyer committed, of course, the murders of the Harbits in 1982, and I think the evidence of the Compton murder didn't come together, really, until 1983, and I've never talked to the prosecutor about why they didn't charge it, but it seems like if he was already facing two counts of capital murder, that that may have been a reason, but I think more to the point is, was the California Supreme Court unreasonable in the determination that this evidence was legally admissible and properly presented to the jury? But also whether it was sufficient. There is a second claim that's – that was lurking in the brief of opposing counsel, which is that applying – they didn't cite Jackson, but the State court did – applying the Jackson standard, was the evidence sufficient to show that Boyer had committed the murder of Compton beyond a reasonable doubt? And so our job is to find out or to determine whether the State court's determination that it was sufficient was reasonable, not an unreasonable application of Jackson. But the evidence is very scanty, so how – how is it that the – the small amount of evidence that was put forward was enough to show that – that Compton had – that had been murdered by Boyer beyond a reasonable doubt? Well, there was the McDonald's receipt in the car, and then Weisinger's identification. So – so it all seems to hinge on Weisinger's – as she saw someone in a car that looked like Compton's. Is that right? Yes, Your Honor. And then her identification of – Weisinger's identification of Boyer, which had serious problems that were brought out at trial, correct? Yes, Your Honor. But she also did maintain that – I mean, she positively identified him in 1983 in the photo lineup in 1983, and she indicated to the officer by the end of that identification that she was certain. Yes, she had identified other people. But previously said she was 100 percent or 90 percent certain, correct? Yes, Your Honor. She had identified other people. You misidentified twice before, right? Two or three times. With a high level of certainty that that was the – Well, it was the same high level of certainty, right? Yes, Your Honor. But all of this was brought out for the jury. So it was a jury question, and the jury's – there was enough there for the jury to find beyond a reasonable doubt that Boyer committed the Compton murder, and the jury was instructed. So what we're really talking about, is there enough to allow the district court to present the evidence? Yes, Your Honor. I mean, the district court allowed this presentation of this what I thought was flimsy case in the penalty phase, which was pretty critical. Yes, Your Honor. There was. There was substantial evidence. So why shouldn't the district court have acted to keep it out? That's the argument. Because there was substantial evidence. Weisinger's testimony, the receipt, which hooked it up to the car, and it was corroborated in part by Bill Harbitz's testimony that he saw Boyer one evening in August with blood on his shirt, and Boyer said he had been in a knife fight. This was sufficient for the jury to infer that the prosecutor had proved beyond a reasonable doubt. But the jury was also – Yes, Your Honor. And she explained that trial at length why she did that. She said she was young, and she felt like if the police were calling her in, that they must have the right person, or that they must have the suspect. And so she felt like she needed to identify someone. But she also said that when she identified – she was certain in 1983 when she identified Boyer. So at that point, it was really a question for the jury, and the jury was instructed that they had – the prosecutor had to prove it beyond a reasonable doubt and that it was up to each of them to decide whether the prosecution had met the burden, and the jury is, of course, presumed to have abided by the court's instructions. And what's interesting is in the court, when the trial court did the automatic motion for a reduction of the sentence, although the trial court reaffirmed for a third time that the evidence was properly presented to the jury, the trial court didn't consider the evidence of the Compton murder, yet still found that the weight of the evidence supported the jury's death verdict. And that finding was correct. I mean, the circumstances of this crime were really serious and egregious. Boyer didn't just murder two strangers. He murdered two people that had been kind to him in the past and had lent him money. According to what he told Dr. Klatt, Eileen Harbis invited him into the home that day, offered him some food, and told him to go back and talk to Francis in the back bedroom. And then he slaughtered them and took their money. He'd also committed a strong arm robbery a couple months before that and an assault. So the weight of the evidence, even without the Compton murder, which was properly admitted, still supported the jury's verdict. And the only, if there were any improper law enforcement activity, it was for IDs after 1983? Yes, Your Honor. And they were never given to the jury? No. And that's part of what the California Supreme Court based its decision on, was how circumscribed Weisinger's testimony was. It was limited to the 1983 identification. She wasn't asked to identify Boyer in court. It was just limited to that 1983 identification. But the trial court, or the California Supreme Court, reasonably rejected Boyer's claim that the trial court erred in failing to hold a evidentiary hearing, because there is no Supreme Court precedent that requires such a hearing. Counsel, if you're through on that point, can we go back to page 161 of the record, which is the Noodleman- Yes. Letter. Certainly it mentions the MRI of the brain was normal, but what about that last paragraph? It suggests that this man undergoes neuropsychometric testing and a PET scan. When your counsel, and this is your expert, and your expert is telling you you should do this in order to fully evaluate, isn't that a red light that tells you you've got to do something more? If Dr. Noodleman had been the only expert that counsel had consulted, then we might have a problem. But he wasn't the only expert that counsel consulted. We know that before the 1984 trial, counsel consulted with Dr. Klatt. And Dr. Klatt told him there was no basis for the defenses of unconsciousness or insanity. And none of the experts counsel contacted after that provided any information to the contrary. And neither of the two court appointed experts opined that Boyer was legally insane at the time of the crime. In fact, Dr. Loomis opined that he was legally sane at the time of the crime and legally sane in 1984. And doctors Loomis, Klatt, and Kaufman all diagnosed Boyer with an antisocial personality disorder. So in light of the consistency of the evidence, the fact that brain damage does not necessarily negate or lessen criminal liability, and the strong evidence that Boyer's behavior that night with school directed, the California Supreme Court could have reasonably concluded that Boyer failed to rebut the presumption that counsel was competent in foregoing further investigation of the brain damage. The penalty phase, and that's the argument that I understood opposing counsel to make. If there's evidence that he has a lessened, that Boyer had a lessened moral ability or ability to tell right from wrong, even if not legally insane, would that, the argument I understand is wouldn't that evidence have an effect on the jury as to whether or not death penalty is appropriate for this case? Dr. Kasanoff's testimony, or her declaration, if she were to testify in accord with her declaration, it wouldn't have made a difference, because her opinion that Boyer was not culpable for the Harbits murders was based on her determination that he had a sense of guilt, and a psychotic break, which was based, of course, on the hallucination claim. And the hallucination claim was one that was not considered by any of the other experts. They were all suspicious about it, and one that Boyer's jury rejected. So it is not reasonably probable that the jury would have reached a different verdict if they had heard that he had a hallucination based on brain damage, in whole or in part, rather than just drug use. And they also did hear evidence about Boyer's traumatic, you know, the first four years of his life, and how he was neglected by his biological parents, and sexually abused by his father. And they heard expert testimony from Dr. Salt and MSCC Sally Forbes about how it affected him. So they had a pretty good idea of what Boyer's life was like, and more from his mother as well. So it wouldn't have lessened his culpability, because the basis for Dr. Kasanoff's expert opinion was suspect. Anything further, counsel? I just wanted to mention one point real quick on the evidentiary hearing. The fact that the California Supreme Court didn't hold an evidentiary hearing, or the state court didn't, doesn't mean that their findings are not entitled to deference, because the state court record was more than adequate for the California Supreme Court to determine any factual questions. What's the effect of Ryan v. Hurls in this case? Okay, Ryan v. Hurls. That was cited in the reply brief. It is distinguishable, because that case, as Your Honor pointed out, involved a judge and a judicial bias claim. And the problem there, according to the majority, was that the defendant really didn't get to put his side of the story forward. And in this case, of course, Boyer did have the opportunity to present his side to California Supreme Court. He presented his habeas petition and declarations in support of it as well. So we have a fully developed record here, or a record that an appellate court would believe was developed enough, could reasonably find was developed enough to decide the factual issues. Thank you, counsel. Anything further? No, Your Honor. Because the California Supreme Court reasonably rejected all of Boyer's claims, we would ask that this court affirm the district court's denial of habeas relief. Thank you, counsel. Mr. Seaman or Mr. Levine, you have some reserve time. Joel Levine again, Your Honors. I'm only going to address, unless the court has some additional questions, just a couple of thoughts regarding the Compton homicide. First, as the evidence was being disclosed in the trial, even the trial court initially said, I think we need to have an evidentiary hearing here. And I might even entertain the directed verdict motion if one is made at the end. And then he changed his mind inexplicably on both of those things and permitted the one-sided, very, very brief offer of proof to be made, which enabled these things to come before the jury. So I think that that needs to be noted in terms of some of the questions I heard a few moments ago. But the other thing that sort of struck me from the questions that were being posed to the Attorney General is regarding the sufficiency of the evidence argument on the Compton murder. Let's assume for a moment, we weren't talking about the Harbits murders here. We just had a trial, and Mr. Boyer had been convicted by a jury on this evidence of the Compton murder. And his appellate lawyer brought a claim before this court that it was legally an insufficient charge and ought to be reversed on the grounds of insufficiency of the evidence. If you had just those issues before you, I dare say that you would have to reverse that conviction. If that's the case, if I'm, I'm, I'm. That's not the case, because that very issue has gone now to the state court, who said, not a problem. And now, then, after having done that, we have it now in our court. So we have some deference to give to the state court who has the first shock at this. And then we come in with the second point. And that makes it a little bit different than the one you're giving me. It is a little bit different. And we go, we can go back to our conversation about hurls and how much deference should be given. But by the same token, after all that has been conducted, in order to affirm the admission of that Compton murder evidence, this court has to be able to say that that was a reasonable application of existing Supreme Court law. And we take issue with that. I understand your argument. Thank you. Unless you have any further questions, we're prepared to submit. No further questions. Thank you, counsel. The case just argued will be submitted for decision, and the court will adjourn.
judges: O'scannlain, Ikuta, N.R. Smith